# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT

OF WEST VIRGINIA

\* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,          \*

    Plaintiff                              \*   Case No.

    vs.                                     \*   2:26-CR-00010

MIGUEL ANGEL AGUIRRE and MIGUEL\*

AGUIRRE-ARELLO, SR.,               \*

    Defendants                         \*

\* \* \* \* \* \* \* \*

VIDEOTAPED DEPOSITION OF

MANUEL MARVIN TZOC-TZEP

February 10, 2026

Any reproduction of this transcript is prohibited without

authorization by the certifying agency.

2

VIDEOTAPED DEPOSITION

OF

MANUEL MARVIN TZOC-TZEP, taken on behalf of the Plaintiff herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Chassidy E. Bays, a Court Reporter and Notary Public in and for the State of West Virginia, at the offices of Robert C. Byrd United States Courthouse, Magistrate Judge Tinsley's Court Room, 300 Virginia Street East, Suite 2400, Charleston, West Virginia, on Tuesday, February 10, 2026, beginning at 11:13 a.m.

3

A P P E A R A N C E S


JONATHAN T. STORAGE, ESQUIRE

Robert C. Byrd United States Courthouse

300 Virginia Street East

Suite 2400

Charleston, WV  25301

    COUNSEL FOR PLAINTIFF


ANDREW TESSMAN, ESQUIRE

RYAN DONOVAN, ESQUIRE

Hissam, Forman, Donovan, Ritchie, PLLC

700 Virginia Street East

Suite 210

Charleston, WV  25301

    COUNSEL FOR DEFENDANT, MIGUEL ANGEL AGUIRRE


PAUL E. STROEBEL, ESQUIRE

PAUL M. STROEBEL, ESQUIRE

Stroebel & Stroebel, PLLC

405 Capitol Street

Suite 102

Charleston, WV  25301

    COUNSEL FOR DEFENDANT, MIGUEL AGUIRRE-ARELLO, SR.

4

A P P E A R A N C E S (Cont.)


ROGER LAMBERT, ESQUIRE

Lambert Law Offices, PLLC

P.O. Box 588

Hurricane, WV  25526

      COUNSEL FOR DEPONENT


ALSO PRESENT: JOHNNIE BENNINGFIELD, INTERPRETER

5

INDEX

DISCUSSION AMONG PARTIES                                8 - 12

WITNESS: MANUEL MARVIN TZOC-TZEP

EXAMINATION

   By Attorney Storage                                  13 - 57

EXAMINATION

   By Attorney Tessman                                  57 - 70

DISCUSSION AMONG PARTIES                               70 - 71

CERTIFICATE                                                  72

6

EXHIBIT PAGE


                                                                PAGE

NUMBER            DESCRIPTION                      IDENTIFIED

GOVERNMENT'S/PLAINTIFF'S EXHIBITS:

  1               Green Card Photo                     52

  2               Immunity Agreement                   55

7

OBJECTION PAGE

ATTORNEY                                    PAGE

Tessman        11, 15, 16, 17, 18, 19, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 41, 41, 42, 42, 43, 43, 43, 44, 44, 45, 45, 45, 45, 45, 46, 46, 46, 46, 47, 47, 48, 48, 48, 48, 49, 49, 49, 50, 50, 50, 51, 51, 51, 52, 53, 63, 54, 54

Stroebel       12, 15, 16, 17, 18, 19, 20, 21, 24, 25, 27, 28, 29, 30, 31, 32, 33, 34, 36, 38, 42, 43, 43, 43, 43, 460, 50, 51, 54, 54, 54

Donovan        21

Storage        59, 62, 64, 65, 65, 66, 67, 69, 70

Lambert        60, 61

8

                    S T I P U L A T I O N

-------------------------------------------------------------

(It is hereby stipulated and agreed by and between

counsel for the respective parties that reading, signing,

sealing, certification and filing are not waived.)

-------------------------------------------------------------

                    P R O C E E D I N G S

-------------------------------------------------------------

COURT REPORTER:  I was curious if you wanted the same option that Storage has decided to do. He has decided to take the transcript order form and email it to us with the preferences on it.

ATTORNEY TESSMAN:  Yeah, that's fine.

COURT REPORTER:  Okay.

That email address that was on the bottom of the card, if you want to do the same, ---

ATTORNEY TESSMAN:  Yeah.

COURT REPORTER:  --- you've got the job number and everything.

ATTORNEY TESSMAN:  That's what I was going to do anyway, so.

COURT REPORTER:  Okay.

Just want to make sure.

ATTORNEY TESSMAN: I just didn't ask

9

permission like Jonathan did.  I'm sorry.

COURT REPORTER:  How dare you.  All the parties have order forms and know about the video as well.  They are going to email Sargent's post deposition ---

VIDEOGRAPHER:  Okay.

COURT REPORTER:  --- with their orders.

VIDEOGRAPHER:  Okay.

---

(WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

---

VIDEOGRAPHER:  We are now on the video record.  My name is Chad Noel.  I'm a Videographer employed by Sargent's Court Reporting Services.  The date today is February 10th, 2026 and the current time is 1 --- 11:13 a.m.  This deposition is being taken at 300 Virginia Street East, Charleston, West Virginia, 25301, case number 2026R00056.  The name of the witness is Manuel Marvin Tzoc-Tzep.

Will the attorneys present state their names and the parties they represent?

ATTORNEY STORAGE:  This is Jonathan Storage, Assistant United States Attorney from the Southern District of West Virginia, representing the

10

United States.

ATTORNEY TESSMAN:  Andrew Tessman and Ryan Donovan representing Miguel Aguirre.

ATTORNEY PAUL E. STROEBEL:  Paul E. Stroebel and Paul M. Stroebel representing the Defendant Miguel Aguirre-Arello, Sr..

ATTORNEY LAMBERT:  Roger Lambert, Counsel on behalf of the witness, Manuel Marvin Tzoc-Tzep.

VIDEOGRAPHER:  All right.

And at this time, the Court Reporter - Court Reporter may now swear in the Interpreter.

---

JOHNNIE BENNINGFIELD,

CALLED AS AN INTERPRETER IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, AND INTERPRETED AS FOLLOWS:

---

VIDEOGRAPHER:  All right.

And at this time, the Court Reporter may now swear in the witness and we can proceed.

---

MANUEL MARVIN TZOC-TZEP,

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

11

---

ATTORNEY TESSMAN:  At this time, the Defendant Aguirre would like to place an objection on the record to this deposition taking place for all the reasons that we stated in our motion to quash.  This deposition violates my client's confrontation clause rights under the Sixth Amendment.  We would just restate all of our objections that we specifically put in the motion to quash.  And in addition, we would like to add that this witness is not truly unavailable because the Government could have given this witness a material witness visa and chose not to do so.  The statutes make it clear that this is a mechanism available to the Government under 8 USC 1184(A)(1) and (A)(2).  The law enforcement may request the material witness visa upon application under 8 CFR 214.2 T-1.

We would also like to --- in addition to the cases cited in our brief, we would also like to add that in United States v. Mann, 590 F.2d 361, First Circuit case from 1978, the First Circuit concluded that where it was clear the prime reason for the deposition was the impermissible one of clearing the way for this critical witness to leave the Court's jurisdiction, the Government should not have been permitted to take the

12

deposition.  We would also like to add United States vs Allie, 978 F.2d 1401, a Fifth Circuit case from 1992, requires a good faith showing of unavailabe --- unavailability.  The Government has to take additional steps other than simply asserting deportability to make that showing.  And for all these reasons, we object to this deposition taking place.

ATTORNEY PAUL E. STROEBEL:  And on behalf of Defendant Aguirre-Arello, we would join in the objection to this deposition that was just made on the record, both for the reasons in the motion to quash that was previously filed, as well as the reasons that were stated on the record here today by Mr. Tessman.  We join in all of the cases cited as well as the facts and arguments made.  And I would also like to place on the record here today that there are a number of documents that were provided this morning that are going to be referenced in this deposition, have been marked as exhibits, but I was not provided a copy of those documents until roughly ten minutes prior to this deposition starting here today.

---

EXAMINATION

---

13

BY ATTORNEY STORAGE:

Q.    Sir, will you please state and spell your name?

A.    Manuel Marvin T-Z-O-C, T-Z-E-P.

Q.    How old are you?

A.    Twenty-six (26).

Q.    What is your birthdate?

A.    ▆▆▆▆▆▆▆▆▆▆, 2000.

Q.    What is your highest level of education?

A.    Sixth grade.

Q.    Are you able to fully understand the language interpreter we have here today?

A.    It's a little bit complicated because I speak a dialect.

Q.    Okay.

A dialect of Spanish?

A.    A dialect from over there from my country, K'iche.

Q.    Did you go to school and learn Spanish?

A.    No.  I came from a country seeking opportunities.

Q.    Okay.

How do you know Spanish?

A.    Well, learning here.  I've learned a little bit here.

14

Q.    So all of the Spanish you know, you learned in the United States?

A.    Yes.

Q.    If at any time you have trouble understanding the Interpreter, will you please let me know?

A.    Yes.

Q.    Do you understand that you have been sworn to tell the truth today?

A.    Yes.

Q.    Do you understand that the Government can bring charges against you if you tell lies here?

A.    Yes.

Q.    Do you understand that you have an immunity agreement with the United States?

A.    Yes.

Q.    And do you understand that the immunity agreement shields you from prosecution based on anything you say today assuming that you tell the truth?

A.    Yes.

Q.    Do you understand that if you lie today, the immunity agreement will not protect you?

A.    Yes.

Q.    Where were you born?

A.    In Guatemala.

15

Q.    When did you come to the United States?

A.    I left my country on October the 17th, 2017. On - on November the 3rd, I arrived to Houston, Texas. I was there for half a day. I arrived here on November the 6th in West Virginia. On November the 9th, 2017, I started working in the Rio Grande Restaurant.

Q.    And all of those dates are in 2017.

Is that right?

A.    Yes.

Q.    How did you enter the United States?

A.    Immigrating illegally, criminally. I don't know what you call it.

Q.    Did you enter through a legal port of entry?

A.    No.

ATTORNEY TESSMAN:  At this time, we would place an objection on the - on the record as to relevance.

ATTORNEY PAUL E. STROEBEL:  We would join in that objection.

BY ATTORNEY STORAGE:

Q.    How did you get to West Virginia?

A.    Well, some people picked me up in Houston and I'm still here.

Q.    Why did you come to West Virginia?

16

ATTORNEY TESSMAN:  Same objection.  This is not relevant.

ATTORNEY PAUL E. STROEBEL:  We join in that objection.

THE WITNESS:  Well, I came here to work.

BY ATTORNEY STORAGE:

Q.    Did you know anybody in West Virginia?

ATTORNEY TESSMAN:  Same objection, relevance.

THE WITNESS:  Yes, I had a brother.  He was the one who - the one who --- I arrived with him.

ATTORNEY PAUL E. STROEBEL:  And we join in that objection.

THE INTERPRETER:  That could also be interpreted I arrived to him.

BY ATTORNEY STORAGE:

Q.    Your brother was already here in West Virginia?

ATTORNEY TESSMAN:  Objection to relevance.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  No.  He had already been deported.

BY ATTORNEY STORAGE:

Q.    Was your brother in West Virginia before?

17

ATTORNEY TESSMAN:  Objection to relevance.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  Yes.  He was here when I arrived.

BY ATTORNEY STORAGE:

Q.    And where did your brother live?

A.    In an apartment next to the restaurant.

Q.    Did your brother work for the Rio Grande Restaurant in Nitro?

ATTORNEY TESSMAN:  Objection to relevance.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

Q.    Was he deported while he was working at the Rio Grande Restaurant in Nitro?

ATTORNEY TESSMAN:  Objection to relevance.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

Q.    Are you familiar with the Rio Grande Mexican Restaurant in Nitro?

18

A.    Yes.

Q.    What is your brother's name?

ATTORNEY TESSMAN:  Objection to relevance.

THE WITNESS:  Diego Alfredo.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.    Do you know when he was deported?

ATTORNEY TESSMAN:  Objection to relevance.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  I don't recall.

BY ATTORNEY STORAGE:

Q.    Have you ever worked at the Rio Grande Mexican Restaurant in Nitro?

A.    Yes, yes, that's where I was working.  That's where the officers arrived and took us.

Q.    And I believe your testimony was that you started working there on November the 9th of 2017.

Is that correct?

A.    Yes.

Q.    Why did you apply to work at the Rio Grande Mexican Restaurant in Nitro?

A.    Can you ask that in another way?

19

Q.    If your brother had already left the United States, why did you come to work at the Rio Grande Restaurant in Nitro?

A.    No, he was there.  He was working there and --- there was work there and he called me, and so I arrived there.

Q.    Did you apply to work there because you knew you could get a job?

ATTORNEY TESSMAN:  Objection to relevance.

THE WITNESS:  Yes.

ATTORNEY PAUL E. STROEBEL:  Same - same objection.  Also it's leading.

ATTORNEY TESSMAN:  Also, I'd - I'd like to put a - a longer speaking objection on the record right now.  As my co-counsel mentioned, we were only provided with three pages of discovery this morning and one of them is a picture of a permanent resident card.  The other is a --- the other document is two pages.  It's a Homeland Security Report of Investigation.  In - in this document, it has very little information about this witness's arrest and post-arrest interview.

Our - our objection is that a Rule 15 deposition in a criminal case is not a discovery tool and that is exactly what is happening right now.  This - the

20

Government is using this deposition as a way to gain evidence against my client.  That is an inappropriate use of Rule 15, and I have articulated this in our motion to quash as well.  I - I have some cases that, that I want to put on the, on the record.  United States versus Hajebeh (sic), H-A-J-E-B-E-H, 284 F Supp, 2d 380, Eastern District of Virginia.  It requires the party moving to take the - the deposition to demonstrate materiality of the testimony.  And that aligns with the Brady standard. It is --- it discusses using this Rule 15 deposition as a discovery device, which is inappropriate for a Rule 15 deposition.

United States versus Edwards, 69 F.3d 419, a 10th Circuit case from 1995 that states Rule 15 does not contemplate the use of depositions of adverse witnesses as discovery tools in criminal cases.  The United States versus Kelley, 36 F.3d 11 --- 1118 D.C. Circuit.  It says the purpose of a Rule 15A deposition is to preserve testimony for trial, not to provide a method of pre-trial discovery.

We would - we would move to limit this deposition to just the discovery that was produced this morning, which consists of two paragraphs of a report of investigation.  We object to anything outside the bounds

21

of that report coming in, in this deposition.

ATTORNEY PAUL E. STROEBEL:  Again, on behalf of Mr. Aguirre-Arello, Sr., we would join in that objection.  We would join in the cases, as well as case law, facts, and arguments raised by Mr. Tessman in the hearing.

BY ATTORNEY STORAGE:

Q.    Sir, who is Miguel Aguirre-Arello, Sr.?

A.    Well, the boss, the chief of the restaurant.

Q.    Okay.

Do you know if he owns the restaurant?

ATTORNEY TESSMAN:  Same objection that we just noted as to the scope of this deposition.  We will place on the record a standing objection to the rest of the Government Counsel's questions that are outside the scope of the discovery that was provided to us this morning.

ATTORNEY DONOVAN:  Can we have a standing objection or do you want us to preserve each question?

ATTORNEY STORAGE:  No, standing objection is fine.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  Yes, he is the owner.

22

ATTORNEY PAUL E. STROEBEL:  And I'd also ask for the same standing objections.

ATTORNEY STORAGE:  Agreed.

BY ATTORNEY STORAGE:

Q.    Who is Miguel Angel Aguirre?

A.    The son.

Q.    And does he have any position at the restaurant?

A.    Yes.

Q.    What is his position?

A.    He's the manager.

Q.    When you started working at the restaurant, who hired you?

A.    The daughter, Isabel Aguirre.

Q.    So Miguel Jr.'s sister?

ATTORNEY TESSMAN:  We would again object. I know we placed a standing objection on the record, but this is obviously, at this point, a discovery device.

ATTORNEY STORAGE:  Okay.

The objection has been noted and is standing.

BY ATTORNEY STORAGE:

Q.    Please answer the question, sir.

A.    Yes.

23

Q.    What kind of work were you hired to do?

A.    I would do the chips every day.

Q.    How long did you work at the restaurant?

A.    I've been there eight years.

Q.    Did your jobs change while you worked there?

A.    Yes.  I'm proceeding along.  In other words, when someone goes, they'll --- they'll take me up to the next position and then the next one.

Q.    As of the last day you worked at the restaurant, what was your position?

A.    The second in command.

Q.    So who did you report to?

A.    What are you asking?

Q.    I'm asking who's your boss?

A.    Well, for me, both of them.

Q.    When you say both --- when you say ---.

A.    The father and the son.

Q.    Okay.

And just to clarify, Miguel Sr. and Miguel Jr.?

A.    Yes.

Q.    As of the last day that you worked at the restaurant, how much were you paid per hour?

A.    I don't know because I wasn't paid hourly.  I was paid every two weeks.

24

Q.   How much were you paid every two weeks?

A.   When I started, I was being paid $1,100.  And then, you know, if you worked hard, if you put your heart into it, you know, like the bosses, they'll give you raises.  And when I was --- when I was caught, I was being paid $1,850.

Q.   Were you paid in cash?

A.   Yes.

Q.   Did Miguel ---?

ATTORNEY TESSMAN:  Objection to relevance.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.   Did Miguel Sr. ever pay you in cash?

A.   Yes.

ATTORNEY TESSMAN:  Same objection.

BY ATTORNEY STORAGE:

Q.   Did Miguel Jr. ever pay you in cash?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

Q.   Who else was paid in cash at the restaurant?

ATTORNEY TESSMAN: Objection.  He doesn't have personal knowledge of this, as to this question.

25

THE WITNESS:  I don't know because they wouldn't pay us all at one time.

BY ATTORNEY STORAGE:

Q.    Why were you paid in cash?

ATTORNEY TESSMAN:  Objection, calls for speculation.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  I don't know.

BY ATTORNEY STORAGE:

Q.    Why did you believe you were paid in cash?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  Because I am illegal or criminal.  I don't have a Social Security.

ATTORNEY TESSMAN:  Same objection.

BY ATTORNEY STORAGE:

Q.    Did you file taxes on the cash you earned?

ATTORNEY TESSMAN:  Objection.  Objection to relevance.  This is not a tax case.

THE WITNESS:  No.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.    To clarify, the answer was no?

26

A.    No, I did not.

Q.    As of the last day that you worked at the restaurant, how many days a week did you typically work?

A.    Well, six.  It was six days of work and then Tuesdays were off.

Q.    As of the last day you worked at the restaurant, how many hours a day did you typically work?

A.    Well, I didn't have a fixed time to start.  I would go in at 9:00 or 10:00 in the morning.

Q.    And when would you leave?

A.    I would go out at 3:00 for two hours on a break and then I'd come back at 5:00.

Q.    And after you finished your five o'clock shift, when would you leave?

A.    At 10:00.

Q.    Do you know what an I-9 is?

A.    No.

Q.    Did anyone at the restaurant ask you to show them documents to prove that you were allowed to work in the United States?

A.    No.

Q.    At the time you started working at the restaurant, did you have legal status in the United States?

27

A.   No.

ATTORNEY TESSMAN:  I place an objection in the record that it calls for a legal conclusion.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.   At the time you started working at the restaurant, were you authorized to work in the United States?

ATTORNEY TESSMAN:  Same objection.

ATTORNEY PAUL E. STROEBEL:  Same objection, legal conclusion.

THE WITNESS:  I don't know how to answer that because I'm illegal.

BY ATTORNEY STORAGE:

Q.   Okay.  Thank you.

Did Miguel Jr. know that you did not have lawful status in the United States?

ATTORNEY TESSMAN:  Objection, calls for the mental status of a - of a witness.  This witness has no foundation to answer.

THE INTERPRETER:  I'm sorry.  The Interpreter did not catch your question.

BY ATTORNEY STORAGE:

28

Q.    Did Miguel Jr. know that you did not have lawful status in the United States?

ATTORNEY TESSMAN:  Same objection.

THE WITNESS:  I don't know.

BY ATTORNEY STORAGE:

Q.    Did you ever discuss it with him?

ATTORNEY TESSMAN:  Same objection.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

Q.    Did either Miguel Sr. --- did - did Miguel Sr. know that you did not have lawful status in the United States?

ATTORNEY TESSMAN:  Same objection, calls for speculation as to what my client might have known or not known, and this witness doesn't have the ability to answer that, and there's no foundation.

THE WITNESS:  I believe he did.

BY ATTORNEY STORAGE:

Q.    Okay.

And why do you say that?

ATTORNEY TESSMAN:  Objection.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  Because you can look at

29

someone and tell that they're illegal.

BY ATTORNEY STORAGE:

    Q.    Did you ever have a discussion with Miguel Sr. about your legal status?

          ATTORNEY TESSMAN:  Objection, hearsay.

          THE WITNESS:  No.

BY ATTORNEY STORAGE:

    Q.    But you believe he knew that you were illegal?

          ATTORNEY TESSMAN:  Objection.

          ATTORNEY PAUL E. STROEBEL:  Same objection, calling for speculation on what another witness knew.

          THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

    Q.    Did Miguel Jr.'s sister know that you were illegal when you applied to work?

          ATTORNEY TESSMAN:  Same objection.

          ATTORNEY PAUL E. STROEBEL:  Same objection.

          THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

    Q.    How do you know she knew that?

          ATTORNEY TESSMAN:  Same objection.

          ATTORNEY PAUL E. STROEBEL:  Same

30

objection.

THE WITNESS: Well, how can I explain it to you? They know that you arrive illegally, you know.

ATTORNEY TESSMAN: I move to strike that answer.

ATTORNEY PAUL E. STROEBEL: Same.

BY ATTORNEY STORAGE:

Q. You had testified a minute ago that no one had asked you for your documents.

Right?

A. Yes.

Q. And you testified that Miguel Jr.'s sister is the one who hired you.

Right?

A. Yes.

Q. So therefore, Miguel Jr.'s sister did not ask you for your identity documents ---?

ATTORNEY TESSMAN: I object to the form of these questions. They're all leading.

ATTORNEY PAUL E. STROEBEL: Same objection.

BY ATTORNEY STORAGE:

Q. And Miguel Jr.'s sister did not ask you to produce any documents when you were hired, did she?

31

ATTORNEY TESSMAN:  Same objection.

ATTORNEY PAUL E. STROEBEL:  Same objection, still leading.

THE WITNESS:  She did not.

BY ATTORNEY STORAGE:

Q.  Did Miguel Sr. know that your brother was illegal?

ATTORNEY TESSMAN:  Objection.

ATTORNEY PAUL E. STROEBEL:  He's calling for the witness to speculate as to what my client knew or didn't know.

THE WITNESS:  I don't know that because I don't think he was there when he arrived.

BY ATTORNEY STORAGE:

Q.  You don't believe that Miguel Sr. was at the restaurant when he arrived?

A.  Well, I think so.  I don't know.  He was in Mexico and he just came to live here just in 2021 or 2022.

Q.  Are you talking about your brother?

A.  No, the boss.

Q.  Do you know if Miguel Sr. knows that your brother was deported?

ATTORNEY TESSMAN:  Objection.

32

ATTORNEY PAUL E. STROEBEL:  Same objection.

ATTORNEY STORAGE:  We understand the objection.

BY ATTORNEY STORAGE:

Q.    Please answer the question.

A.    I believe he does because he didn't show up for work.

ATTORNEY TESSMAN:  Move to strike the answer of the witness.

ATTORNEY PAUL E. STROEBEL:  Same.

BY ATTORNEY STORAGE:

Q.    Where were you living during the time you worked at the restaurant?

A.    Well, I lived here.  I lived there for quite a while in the apartment next to the restaurant.  And when the boss bought the house behind the restaurant, when he was fixing it up, they were changing out some pieces.  Since it's right there beside when I went out on break, I went in there and they were working and I asked him if he'd let me live there in the house, and he said, yeah, that's fine.

ATTORNEY PAUL E. STROEBEL:  Move to strike.  Hearsay.

33

THE WITNESS:  And that's when I moved into there after four years.

BY ATTORNEY STORAGE:

Q.    I see.  And do you know the address of that house?

A.    Yes, ██ Hillside Drive, Nitro, West Virginia ---

Q.    And who owns --- and who owns that ---?

A.    --- 25143.

Q.    And who owns that house?

ATTORNEY PAUL E. STROEBEL:  Objection.  No foundation that he knows --- that he's able to answer that.

THE WITNESS:  I believe Miguel Aguirre.

BY ATTORNEY STORAGE:

Q.    Senior or Junior?

A.    Father.

ATTORNEY TESSMAN:  Objection.  I move to strike the witness's answer based on speculation.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.    How do you know he owns that house?

A.    Because the bills would arrive in his name.

34

Q.    Did you pay him rent?

A.    Yes.

Q.    Did you ever pay Miguel Jr. rent?

A.    Yes, sometimes.

Q.    For the same residence, ▆▆ Hillside Drive?

A.    Yes.

Q.    Did Miguel Jr. know that you did not have lawful status?

ATTORNEY TESSMAN:  Objection.  This witness cannot testify as to what another individual knew.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

Q.    How do you know that Miguel Jr. knew that you didn't have lawful status?

ATTORNEY TESSMAN:  Same objection.

THE WITNESS:  Just because I believe the way a person is.  I mean, you know right away if a person is.

BY ATTORNEY STORAGE:

Q.    Did you ever tell Miguel Jr. that you were unlawfully present in the United States?

35

A.    No.

Q.    Did he ever ask you whether or not you were unlawfully present ---

ATTORNEY TESSMAN:  Objection.

BY ATTORNEY STORAGE:

Q.    --- in the United States?

ATTORNEY TESSMAN:  Calls for hearsay.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

Q.    Did Miguel Sr. live next door to you?

A.    Monday through Friday, he goes to Teays Valley because his children go to school.  And on Saturday and Sunday, he would stay there beside the house.

Q.    How much did you pay in rent per month?

ATTORNEY TESSMAN:  Objection, asked and answered.

THE WITNESS:  $160.

BY ATTORNEY STORAGE:

Q.    Did that rent ever change or vary?

A.    So we started off paying $125, but the bills would arrive and just the receipts for, for example, for light would be sometimes $800, $900, $700.  So if you think that they were making a lot of money off of that house, you're mistaken because ---.

36

THE INTERPRETER:  Go ahead.

THE WITNESS:  The first person was living there and then I arrived.  We were there for months by ourselves.  And then there were some other people and then they would leave, but they would leave the light bill at a - at a high expense.  I am sure that he actually owed out of pocket for all of the expenses on the house.

BY ATTORNEY STORAGE:

Q.    So did you have any roommates?

ATTORNEY TESSMAN:  Objection to relevance.

THE WITNESS:  Well, the two of us were living there and then some other people arrived.

BY ATTORNEY STORAGE:

Q.    As of January the 16th of 2026, who was living with you?

ATTORNEY TESSMAN:  Objection to relevance.

THE WITNESS:  There were, let's see, one, two, three, four, like, seven of us living there.

BY ATTORNEY STORAGE:

Q.    Okay.

Can you please name them?

ATTORNEY TESSMAN:  Objection.

ATTORNEY PAUL E. STROEBEL:  Same

37

objection.

THE WITNESS:  It was me, Jose Alfredo, Valentina, Ariosto, Rosmery, Rosa, Rufino, and Fernando.

ATTORNEY TESSMAN:  Counsel, can we take a bathroom break?

ATTORNEY STORAGE:  Yes.  We're going to go off the record for five minutes.

VIDEOGRAPHER:  Going off the --- going off the video record at 11:54 a.m.

OFF VIDEO

                            ---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

                            ---

ON VIDEO

VIDEOGRAPHER:  Going back on the video record at 12:02 p.m.

BY ATTORNEY STORAGE:

Q.    How long has Rosmery lived at the house?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  Just months, like six or seven.

BY ATTORNEY STORAGE:

Q.    Do you know if she's married?

ATTORNEY TESSMAN:  At this time, I'd like

38

to put an objection on the record.  Not only is the Prosecutor going outside the scope of what was produced in discovery and using this Rule 15 deposition as a discovery device, he is also using this deposition as an investigatory tool as if this is some sort of in-custody interview of this witness.  This witness has rights and should not be subjected to this.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.    Do you know if Rosmery is married?

A.    Yes.

Q.    Who is she married to?

A.    Ariosto.

Q.    The same Ariosto who lives in the house as well?

A.    Yes, they lived together.

Q.    Do you know if Rosmery has legal status in the United States?

ATTORNEY TESSMAN:  Objection, calls for speculation.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  I do not know.

39

BY ATTORNEY STORAGE:

Q.    Do you know if Rosmery has a counterfeit green card?

ATTORNEY TESSMAN:  Objection, calls for speculation.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  I do not know.

BY ATTORNEY STORAGE:

Q.    Do you know if Rosmery has a counterfeit Social Security card?

ATTORNEY TESSMAN:  Objection, calls for speculation.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  I believe all of them, yes.

BY ATTORNEY STORAGE:

Q.    I'm sorry?

A.    I believe everyone whose name I gave you has a false Social Security.

Q.    Why do you think that?

A.    Because we share the same cell and I read the papers that they arrive --- that arrive there frequently.

ATTORNEY TESSMAN:  I would just place a

40

--- I would renew my objection to using this deposition as an investigatory tool.

ATTORNEY STORAGE:  We understand the objections.

ATTORNEY TESSMAN:  And please let me finish.  And please ---.

ATTORNEY STORAGE:  Okay.

Moving on to the next question.

ATTORNEY TESSMAN:  Hold on, please.

ATTORNEY PAUL E. STROEBEL:  He's stating his objection for the record.

ATTORNEY STORAGE:  This objection has been already stated numerous times.

ATTORNEY TESSMAN:  And I'll place the objection on the record as a standing objection to the rest of this deposition.

ATTORNEY STORAGE:  Okay.

ATTORNEY PAUL E. STROEBEL:  Same objection.

ATTORNEY STORAGE:  Okay.

BY ATTORNEY STORAGE:

Q.   So you said that you've seen people's letters that come in.

Is that right?

41

A.     Yes.

Q.     And tell me how that translates into you seeing Social Security information.

ATTORNEY TESSMAN:  Objection.  This is all hearsay.  It calls for --- calls for hearsay.

THE WITNESS:  Because the Order there said so.  It said so in the Order.

BY ATTORNEY STORAGE:

Q.     Okay.

A.     Because they don't know how to read what's there, so they seek out someone in the cell to tell them what it says.  What does it say there?  And in the --- in the same cell, that's what they're being told, that this is what it --- this is what it is and you overhear that.

ATTORNEY TESSMAN:  I move to strike that, in that answer.

ATTORNEY PAUL E. STROEBEL:  I move to strike on hearsay as well.

BY ATTORNEY STORAGE:

Q.     Okay.

Do you know anyone named Rosita Mejia-Perez?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

42

Q.    Who is that?

A.    The lady worked there.  She lived in the house.

Q.    Did she have a different name?

A.    According to what I understand, that's what she says.

Q.    So Rosita Mejia-Perez is who out of the people you listed as living in the house?

A.    Well, she lived there.

Q.    Is Rosita Rosmery?

A.    Rosita Rosmery is Ariosto's wife.

Q.    How long did Wilmar Ariosto Pablos-Miguel live at the house?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  The same amount of time as his wife.  They arrived together.

BY ATTORNEY STORAGE:

Q.    Do you know if Ariosto has a counterfeit green card?

ATTORNEY TESSMAN:  Objection, calls for speculation.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  All of them.

BY ATTORNEY STORAGE:

43

Q.    Do you know if he had a counterfeit Social Security card?

ATTORNEY TESSMAN:  Objection.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  I believe so.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.    Do you know if either Miguel Sr. or Miguel Jr. knew that Ariosto had unlawful status?

ATTORNEY TESSMAN:  Objection.  This witness cannot testify as to what someone else knew.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  I don't know.  That's their matter.

BY ATTORNEY STORAGE:

Q.    The same question as for Rosmery.  Is that the same answer?

ATTORNEY TESSMAN:  Same objection.

THE WITNESS:  The same.

ATTORNEY PAUL E. STROEBEL:  And same objection.

44

BY ATTORNEY STORAGE:

Q.    How long did Rosa live at the house?

A.    The same, a few months.

Q.    Do you know if Rosa has legal status?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

Q.    No, you don't know or no, she doesn't?

ATTORNEY TESSMAN:  Same objection.

THE WITNESS:  She does not have it.

BY ATTORNEY STORAGE:

Q.    How do you know that?

A.    Because we came to court here the same day together with her.

Q.    Okay.

So the only --- the basis for that is only the court proceedings.

Is that right?

A.    Yes.

Q.    Do you know anyone named Jimena Gomez-Hernandez?

A.    Jimena?

Q.    Yes.  Does anyone named Jimena Gomez-Hernandez work at Rio Grande as of January the 16th?

45

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  I don't --- oh, you're talking about Rosa?

BY ATTORNEY STORAGE:

Q.    Is that who you understand Jimena Gomez-Hernandez to be?

A.    Yes.

Q.    Is that a false name?

A.    Yes.

ATTORNEY TESSMAN:  Objection, same objection.  Move to strike the witness's answer.

BY ATTORNEY STORAGE:

Q.    How do you know it was a false name?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  Because she said so.

BY ATTORNEY STORAGE:

Q.    How long has Jose Cruz-Perez live at the house?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  About a year and change.

BY ATTORNEY STORAGE:

Q.    Do you know if he had legal status?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  We're all illegal, all of us, because we're all here, everyone from the house.

46

ATTORNEY TESSMAN:  I move to strike that answer.

ATTORNEY PAUL E. STROEBEL:  Same objection.

BY ATTORNEY STORAGE:

Q.    How long had Rufino Hernandez lived at the house?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  Probably some five or six months.

BY ATTORNEY STORAGE:

Q.    And is your answer the same for him regarding his legal status?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  I said everybody.

BY ATTORNEY STORAGE:

Q.    Do you know if he had a counterfeit green card?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

Q.    Do you know how he got the green card?

ATTORNEY TESSMAN:  Objection, calls for speculation.

THE WITNESS:  No.  I think he had it from

47

when he came, because he came from Oklahoma.  I think he got it over there.

ATTORNEY TESSMAN:  Move to strike.  The witness's answer was pure speculation.

THE WITNESS:  Nobody gives anything to anyone here.  You, yourself, have to seek things and find this.  The bosses don't have anything to do with this. This is like if you go to a store, you purchase something.  The seller is not going to say verify your money.  The --- the person who sells it to you is not going to say where did you get your money?  Did you rob it from somewhere?  The only thing that the seller cares --- cares about is that they're selling you something. It's the same for these guys.  I'm not defending anyone. I'm just telling you the truth.  Because if I show up and I say I want to --- I want to work here, what are they going to do?  That's what --- that's the way it is.

BY ATTORNEY STORAGE:

Q.    Do you know a person named Pablo Dominguez?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  That's Rosmery's husband.

BY ATTORNEY STORAGE:

Q.    Did he work at the restaurant?

ATTORNEY TESSMAN:  Objection.

48

THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

Q.    How long did he work here --- work there?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  The same time as his wife.

BY ATTORNEY STORAGE:

Q.    Do you know if Pablo Dominguez has lawful status in the United States?

ATTORNEY TESSMAN:  Objection, calls for speculation.

THE WITNESS:  They're all showing up to the court hearings the same, for the same reason.

ATTORNEY TESSMAN:  Same objection.

BY ATTORNEY STORAGE:

Q.    Okay.

But do you have any personal knowledge?

A.    No.

Q.    When you needed to travel away from the restaurant or from the house on Hillside Drive, how did you arrange for your transportation?

ATTORNEY TESSMAN:  Objection, relevance.

THE WITNESS:  Well, it's right there to the side.  I would just walk to it.

BY ATTORNEY STORAGE:

49

Q.    Pardon.  Let me clarify.  When you needed to leave Nitro, how would you arrange for your transportation?

A.    Oh.  Well, I've got --- I've got my car, my car.

Q.    Okay.

How many vehicles do you have registered in your name in West Virginia?

ATTORNEY TESSMAN:  Objection, relevance.

THE WITNESS:  Two.

BY ATTORNEY STORAGE:

Q.    Did either Miguel Jr. or Miguel Sr. allow you to use one of their vehicles?

ATTORNEY TESSMAN:  Objection, relevance.

THE WITNESS:  No.  I mean, nobody just, like, walk into someone's house.  You can't just do that.  You know, a car is someone's personal possession.

BY ATTORNEY STORAGE:

Q.    Sure.  I don't think you understood my question.  My question is did they ever let you?  Did they ever give you permission to use their car?

A.    No.

ATTORNEY TESSMAN:  Object.

BY ATTORNEY STORAGE:

50

Q.    Did either Miguel Jr. or Miguel Sr. allow any of your housemates to use their vehicles?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

Q.    Does either Miguel Sr. or Miguel Jr. own a passenger van?

ATTORNEY TESSMAN:  Objection, relevance.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

Q.    Who owns the passenger van that's frequently parked at Rio Grande Restaurant?

ATTORNEY TESSMAN:  Objection, relevance.

THE WITNESS:  I'm sorry.  I don't understand what you're asking.

BY ATTORNEY STORAGE:

Q.    Do you understand what a passenger van is?

A.    No.

Q.    Do you know what a van is?

A.    You're talking about the white one?

Q.    Yes.

A.    That's the boss's.  That's for his family when they go to mass or --- or whenever they go out.

ATTORNEY PAUL E. STROEBEL:  Object, move

51

to strike.  No foundation for that question.

BY ATTORNEY STORAGE:

    Q.    Did Miguel Jr. or Miguel Sr. ever instruct you to use the van to pick up employees?

              ATTORNEY TESSMAN:  Objection.

              THE WITNESS:  Never.

BY ATTORNEY STORAGE:

    Q.    Have you ever known employees to be driven in that van?

              ATTORNEY TESSMAN:  Objection.

              THE WITNESS:  Never.

BY ATTORNEY STORAGE:

    Q.    Did Miguel -?

    A.    They arrive there by them --- by themselves or someone will bring them, but they never did.  They never gone to pick anyone up.

    Q.    Did Miguel Jr. or Miguel Sr. ever ask you if you wanted a green card or a Social Security card?

              ATTORNEY TESSMAN:  Objection.

              ATTORNEY PAUL E. STROEBEL:  Objection, leading.

              THE WITNESS:  Never.

BY ATTORNEY STORAGE:

    Q.    Do you own a fake green card with your name on

52

it?

    A.   Yes.

          ATTORNEY STORAGE:  I'm showing him Exhibit 1.

                  ---

          (Whereupon, Government's Exhibit 1, Green Card Photo, was marked for identification.)

                  ---

BY ATTORNEY STORAGE:

    Q.   I've handed you what has been pre-marked as Government's Exhibit 1.  Do you recognize what this is?

    A.   Yes.

    Q.   And what is it?

    A.   It's a false Social Security --- a green card.

    Q.   And more particularly, it's a photo of the green card.

        Is that right?

    A.   Yes, and that's me on it.

    Q.   Okay.

        And did you know it was false when you got it?

          ATTORNEY TESSMAN:  Object to form.

          THE WITNESS:  Yes.

BY ATTORNEY STORAGE:

53

Q.    Okay.

And where did you get it?

A.    I got it from a dude over there in --- I believe it's either Kentucky or Ohio.

Q.    How much did you pay for it?

A.    I believe it was $150.

Q.    Did you ever use this green card to get employment at the restaurant?

A.    Never.  Not --- not once.

Q.    Why did you not use it?

A.    Because it's false.

Q.    During the time you worked for Miguel Jr. and Miguel Sr., were you ever instructed to work at other restaurant locations?

ATTORNEY TESSMAN:  Objection.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

Q.    Has Miguel Jr. or anyone who represents him contacted you or tried to contact you since you were arrested on January the 16th of 2026?

ATTORNEY TESSMAN:  Object to that question.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

54

Q.   Has Miguel Sr. or anyone who represents him contacted you or tried to contact you since you were arrested on January the 16th of 2026?

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  No.  And I haven't tried to contact him either because I don't want to be responsible for anyone.

BY ATTORNEY STORAGE:

Q.   Has anyone from the Aguirre family or their representatives contacted you or tried to contact you since you were arrested on January the 16th of 2026?

ATTORNEY TESSMAN:  Same objection.

ATTORNEY PAUL E. STROEBEL:  Same objection.

THE WITNESS:  No.

BY ATTORNEY STORAGE:

Q.   Has anyone told you or advised you not to cooperate with the Government regarding this matter?

ATTORNEY TESSMAN:  Same objection.  This is well outside the scope of what would be permissible in the trial.

ATTORNEY PAUL E. STROEBEL:  Same objection.

55

                    THE WITNESS:  No.

BY ATTORNEY STORAGE:

    Q.    Has anyone told you to lie today?

    A.    No.

    Q.    Are you sure about that?

    A.    Yes.

    Q.    Has anyone threatened you or your family
regarding your testimony here today?

    A.    No.

            ATTORNEY STORAGE:  I'm going to take a
brief moment.  I'm going to show the witness Exhibit
Number 2.

                        ---

            (Whereupon, Government's Exhibit 2,

                Immunity Agreement, was marked for

                identification.)

                        ---

BY ATTORNEY STORAGE:

    Q.    This is the immunity agreement.  Sir, I've
handed you what has been pre-marked as Government's
Exhibit 2.  Do you see that in front of you?

    A.    Yes.

    Q.    What is it?

    A.    I don't know.

56

Q.    Do you see your signature on the document?

A.    Yes.

Q.    Did you sign that document today?

A.    Yes.

Q.    Is it written in English?

A.    In English, yes.

Q.    Did your Counsel explain to you that that is the immunity agreement?

A.    Yes.

Q.    And so, as you sit here today, do you understand that it is the immunity agreement?

A.    Yes.

Q.    Did the Court Interpreter translate it into Spanish for you?

A.    Yes.

Q.    And do you feel like you understand it?

A.    Yes.

ATTORNEY STORAGE:  To the extent I need to move for the admission of Exhibits 1 and 2, I'll do that, understanding that there's objections pending.

ATTORNEY TESSMAN:  No objection to Exhibit Number 2.

ATTORNEY STORAGE:  That concludes the Direct.

57

ATTORNEY TESSMAN:  At this time, we'd like to take a five-minute recess.

VIDEOGRAPHER:  Going off the video record at 12:25 p.m.

OFF VIDEO

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

ON VIDEO

VIDEOGRAPHER:  Going back on the video record at 12:35 p.m.

ATTORNEY STORAGE:  I just want to make one clarification for the record.  At the time that the case was called, the Court Reporter staff announced the Grand Jury number, matter number for the case.  Instead, the appropriate call should have been the case number, 2:26-CR-00010.  Thank you.

---

EXAMINATION

---

BY ATTORNEY TESSMAN:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    You heard the --- the Government Counsel ask

58

you at the very end of his questioning about whether or not anyone from the restaurant had threatened you.  Do you remember that?

A.    Yes.

Q.    And I would like to ask a different, a slightly different question.  I would like to ask has anyone from the Government, including the --- the officers who arrested you, have they threatened you with anything for your testimony here tonight?

A.    Look, here's the way it was.  I had had breakfast that morning.  I don't know, was it the 5th or whatever that day it was.  I believe it was a Thursday.  It was breakfast time.  I didn't receive, like, the letters that all of my companions received.  Suddenly, my name was read off there and I --- and I was like asking myself what happened.  And then we were brought over here with these guys here in the court, and then I had some doubts, like, why was I brought.  I asked the man there if he knew why I was brought, and he said to me we just want to ask you something.  We just want to talk about something, about Miguel Aguirre-Arello and Miguel Aguirre, son.  I said that's fine.

Q.    And then what happened?

A.    So I went for my cell and he asked me if I had

59

any communication with them and I said ---.

ATTORNEY STORAGE:  Objection, calls for hearsay.

THE WITNESS:  I told him I had called twice to the restaurant to ask for the phone number of a female friend, but they never answered me, I told him. And then he took me to the cell there and I asked him, well, when my deport --- when will my deportation be. And then I asked him, do you work for the marshals or do you work for ,ICE and he told me he worked for ICE.  That was it.

ATTORNEY STORAGE:  Motion to strike the entire statement as unresponsive to the question.

BY ATTORNEY TESSMAN:

Q.   So you --- you stated that you spoke to someone from --- from ICE.

Is that correct?

A.   The man that's there.

ATTORNEY TESSMAN:  And for the record, the witness pointed at the ICE agent sitting at counsel table with Jonathan Storage.  I don't have his name, Jonathan.

ATTORNEY STORAGE:  The Government will proffer that his name is Terrance Taylor with Homeland Security Investigations.

60

BY ATTORNEY TESSMAN:

Q.    And the original question was were you threatened with anything?

A.    No.

Q.    You were not threatened with years in prison?

ATTORNEY STORAGE:  Asked and answered.

THE WITNESS:  Just --- my attorney ---.

ATTORNEY LAMBERT:  Objection to any attorney/client privileged conversation.

THE WITNESS:  So my attorney had said ---.

ATTORNEY LAMBERT:  Hold on.  I would like the Interpreter to instruct the witness that --- that he is being instructed by Counsel to not testify as to anything his attorney told him in any conversations with his attorney.

ATTORNEY STORAGE:  Sir ---.

THE WITNESS:  Well, if you want to know the truth, I don't care.  You guys can do whatever you want.  I have to speak.

BY ATTORNEY TESSMAN:

Q.    Is it --- is it safe to say that you don't ---?

A.    I was brought here to tell the truth and that's what I'm here for.

Q.    Okay.  That's fair.

61

Is it safe to say that you don't really want to be here today testifying?

A. Well, I didn't want to, but I was told that if I didn't do so ---.

ATTORNEY LAMBERT: Hold on, object. I would instruct the witness not to testify to anything his attorney told him or any conversation with his attorney.

BY ATTORNEY TESSMAN:

Q. And, sir, it's --- it's your privilege. You can waive it if you would like.

A. I'm going to continue. I was told that if I didn't go through with this, that the U.S. Attorney's Office would hold me until this case was resolved. I don't care what you guys do to me here. What I care about is my mother. She prays for me every day. I haven't been able to communicate with her for 17 days. But that's what I was told, that if I didn't sign this, that I could be --- that I would be held in jail until this case is resolved.

Q. Sir, did anyone threaten you that you could be charged with a crime and be put in prison?

A. Yes.

Q. And were you --- what is your understanding of what was threatened to you?

62

A.    I feel threatened because I'll be held until this case is resolved.  I don't think I'm the only illegal or criminal person that works in a restaurant for years paid in cash.  I don't think I'm the only one who's doing the same thing.

Q.    Sir, I'll ask you a different question.  What is your goal?  Where do you want to be after your testimony here today?

ATTORNEY STORAGE:  Objection, relevance.

THE WITNESS:  Well, I want to go to my country.  I want to get out of here.

BY ATTORNEY TESSMAN:

Q.    What is your country, sir?

A.    Guatemala.

Q.    I'm going to --- I'm going to ask you some questions about your arrest.

A.    Yes.

Q.    Were you arrested on January 16th, 2026?

A.    Yes.

Q.    And have you been in custody since that day?

A.    Yes.

Q.    And you understand that you may be removed, deported from the United States?

A.    What are you asking me?

63

Q.    You understand after your arrest, there's a likelihood that you will be sent out of the country.

Is that right?

A.    Yes, I know.

Q.    And at this point, you stated that your goal is to leave the country.

Is that right?

A.    Yes, I want to leave here, go home.

Q.    And you signed an immunity agreement with the United States.

Is that correct?

A.    Yes.

Q.    And that agreement requires you to be truthful and testify whenever the Government asks.

Is that right?

A.    Yes.

Q.    And in exchange, your statements cannot be used against you in a criminal case except for perjury or --- or --- or lying.  Do you understand that?

A.    Yes.

Q.    And you understand that the Government has promised not to use your statements here today against you?

A.    Yes.

64

Q.    And do you also understand that the Government can void the agreement if you do not comply here today?

A.    Yes.

Q.    So you understand that your future depends on the Government's interpretation of your cooperation here today?

ATTORNEY STORAGE:  Objection, form of the question.

THE WITNESS:  Yes.

BY ATTORNEY TESSMAN:

Q.    And I'm going to ask you some questions about the restaurant.

A.    Yes.

Q.    You were not an owner of the restaurant?

A.    No.

Q.    And you were not a manager?

A.    Just a worker.

Q.    You didn't hire any employees?

A.    No.

Q.    You did not complete I-9 forms or work authorization forms?

A.    No, none of that.

Q.    You were just simply a worker.

Right?

65

A.    Yes.  They called it a cat.

Q.    Fair enough.  And so after --- on January 16th, you were taken into custody.

Is that correct?

ATTORNEY STORAGE:  Objection, asked and answered.

THE WITNESS:  Yes.

BY ATTORNEY TESSMAN:

Q.    Where did that occur?

A.    Inside the restaurant.

Q.    And what happened after you were arrested?

A.    I was brought here to the jail.  They left us there all night.  They didn't even give us any covers, not even a mattress.  We were --- we went through cold. My bones were hurting me from laying there on the floor and there where people sat.  It was very cold.  They gave us no blankets, no mattress.  We just went through a night of cold.  Like at 7:00 in the morning, we were moved to the gym.

ATTORNEY STORAGE:  I'm going to object to --- I'm going to object to the relevance of this and move to strike as unresponsive.

BY ATTORNEY TESSMAN:

Q.    I'm sorry.  Go ahead.  What happened in the

66

morning?

A.    And then our clothing was changed and we were brought here.  Then they gave us breakfast.  Then, like, at 7:00 or 8:00, we were given like a cover.  Then all of the night, it was the same way, just a cover and nothing else.  You can't get warm.  Then on the third day, they brought a mattress to us.  And on the third day was when we were actually put into a cell.  I'm not favoring anyone and I'm not defending anyone.  I'm just telling you the truth.  If you want the truth, I'm telling you the truth.

Q.    Yes, we want the truth.  Go ahead, sir.

ATTORNEY STORAGE:  Objection, calls for a narrative response.

BY ATTORNEY TESSMAN:

Q.    I'm sorry, sir.  What happened next?

A.    My attorney told me a little while ago if everything works out okay today, that I'll be handed over to ICE then.

Q.    So you expect to be arrested in ICE custody after this hearing?

A.    Yes, according to my attorney.  I don't care if he wants to continue to defend me or if I have to defend myself or I end up in jail.  I don't care.  I'm just

67

telling you the truth.  I'm telling you how things are.

Q.    We appreciate that, sir.

A.    Thank you.

Q.    On January 16th, how many people were detained with you?

A.    The ones of us that were captured.

Q.    Yeah, about how many people?

A.    Like nine.

Q.    And you guys were all together at the --- at the same facility on the evening of January 16th?

A.    Yes.

Q.    And you did not receive a meal until the next day.

Is that right?

ATTORNEY STORAGE:  Objection, relevance.

THE WITNESS:  Food, we did.

BY ATTORNEY TESSMAN:

Q.    When did you receive food?

A.    When we arrived on the 16th, in the evening they gave us a hamburger.

Q.    Okay.

And on the 16th, did any --- any officer from ICE interview you?

A.    There --- there in the warehouse where we were

68

taken --- it's, it was the --- it's the man over there.

ATTORNEY TESSMAN:  And, again, I'm sorry, Jonathan.  What is his name?

ATTORNEY STORAGE:  Special Agent Terrance Taylor.

BY ATTORNEY TESSMAN:

Q.    Is --- so you identified Special Agent Terrance Taylor just now.

Is that correct?

A.    Yes, the man there.

Q.    Was he the individual ---?

A.    And there's another lady.  She's the one that would talk Spanish and she would, she would translate for him.

Q.    And did you agree to be interviewed?

A.    What are you asking?

Q.    Did you speak with the investigating agent and the interpreter?

A.    Well, they just asked me how long I'd been here in the U.S. and where did I cross at, how long I had been working at the restaurant, how long I had been living in the house.  I believe that's all.

Q.    Did they ask you to waive your --- your rights?

A.    No.  They told me I had the right to an

69

attorney and to remain quiet.

Q.    How long did the interview last?

A.    Like four minutes, three maybe.

Q.    A total of three or four minutes with an Interpreter?

A.    Yes.

Q.    Was January 16th stressful for you?

ATTORNEY STORAGE:  Objection, relevance.

THE WITNESS:  Yes.  It was a terrible day.

BY ATTORNEY TESSMAN:

Q.    And that was the same day you were interviewed by Mr. Taylor over there.

Is that correct?

A.    Yes.

Q.    For you --- you stated earlier that the best possible outcome for you is to go back home to Guatemala.

Is that correct?

A.    Yes.  I was hope --- I was --- I was hoping I would be deported.  I wasn't hoping to have to fight a case or be in the situation that I am right now, but here I am.  I was waiting on my deportation.  I wasn't expecting to have to fight my case in the same way.

Q.    As you sit here today, you understand that the Government controls whether or not you can --- when you

70

can go back home.

Is that right?

ATTORNEY STORAGE:  Objection.

THE WITNESS:  Yes.

ATTORNEY TESSMAN:  I have no further questions.

ATTORNEY STORAGE:  Give me like two minutes.

VIDEOGRAPHER:  Going off the video record at 12:57 p.m.

OFF VIDEO

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

ON VIDEO

VIDEOGRAPHER:  Going back on the video record at 1:00 p.m.

ATTORNEY PAUL E. STROEBEL:  There are no questions on behalf of Miguel Aguirre-Arello, Sr. at this time.

ATTORNEY STORAGE:  One moment.  No Redirect.

VIDEOGRAPHER:  All right.

This concludes today's deposition.  The

71

current time is one o'clock p.m.

* * * * * * * *

DEPOSITION CONCLUDED AT 1:00 P.M.

* * * * * * * *

72

STATE OF WEST VIRGINIA   )

CERTIFICATE

I, Chassidy E. Bays, a Notary Public in and for the State of West Virginia, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Chassidy E. Bays
Sargent's Court Reporting Service, Inc.
179 Summers St # 614
Charleston WV 25301
My Commission Expires November 29, 2028

Chassidy E. Bays,

Court Reporter