**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

v.                                                    CRIMINAL ACTION NO. 2:26-cr-00013

PABLO DOMINGUEZ

**MEMORANDUM OPINION AND ORDER**

Pending before the court is Defendant Pablo Dominguez's Motion to Suppress Statements and Dismiss Indictment, [ECF No. 22]. The Government responded, [ECF No. 24], and a pretrial motions hearing was held on May 18, 2026. For the reasons set forth below, Defendant's motion is **GRANTED in part**.

**I.      BACKGROUND**

On January 16, 2026, Homeland Security Investigations ("HSI") agents, with the assistance of Immigration and Customs Enforcement ("ICE") officers,[1] executed search warrants for the Rio Grande Mexican restaurant and a nearby residence in Nitro, West Virginia. [ECF No. 24, at 2]. These judicial warrants were the result of an I-9 audit that HSI agents conducted in the previous weeks pursuant to 8 C.F.R. § 274a.2. *See* [ECF No. 24-1 ("Warrant Application")]. On or about December 18, 2025, an HSI agent issued a Notice of Inspection to the restaurant, which the owner responded to on December 23, 2025, with the documentation of nineteen employees. *Id.* at 11.

---

[1] The ICE officers involved were part of Enforcement and Removal Operations ("ICE ERO"), which is "the deportation arm of ICE." [ECF No. 52 ("Hr'g Tr."), at 25–26]. In addition, the St. Albans and Nitro police departments were on site and assisted. *Id.*

However, Defendant's paperwork was not produced during this process because he was hired after the notice was issued. *See id.* at 11–14; [Hr'g Tr., at 28–29].

HSI Special Agent Terrance Taylor's application for the "search and seizure warrant" stated that investigation into these documents gave him probable cause to believe that most of the restaurant workers were "employed using fraudulently obtained Lawful Permanent Resident cards and/or Social Security Numbers." [Warrant Application, at 6]. Based on the information in the warrant application, Magistrate Judge Tinsley approved the warrant, which included

> the properties and/or persons listed below, for contraband and evidence, fruits, and instrumentalities of violations of [the Immigration and Nationality Act], which are more specifically described in Attachment B of this Affidavit: (a) [the business location], (b) [t]he contents of any locked cabinets, containers, drawers, boxes, or other receptacles large enough for paper record retention at the business location, and (c) [t]he person of any illegal aliens found at the business location.

*Id.* at 3–4, 15.

Federal agents executed the warrant at the restaurant three days later. When federal law enforcement approached the restaurant around 1:00 p.m., they first informed restaurant management of the warrant and allowed the restaurant to be cleared of customers. [Hr'g Tr., at 23–24]. Officers then entered and obtained other employment records and identified the employees present. *Id.* at 43, 45–46, 68–69; [Def.'s Ex. 1, at 2–3]. After concluding the search and identification process, eight individuals, including Defendant, were arrested and taken to an ICE facility in Poca, West Virginia. [Hr'g Tr., at 7–8; Def.'s Ex. 1, at 3].

At the facility, the detained individuals were processed by ICE, which included entry of fingerprints, photographs, and biographical information. [Hr'g Tr., at 8, 30]. During this processing period, the detainees were also interviewed by two HSI agents aided by an interpreter who was a deportation officer. *Id.* at 8, 30–31. The interviews were not recorded nor was there a written waiver of rights. *Id.* at 33–34. However, the Government's witnesses testified that

Defendant received and acknowledged his *Miranda* rights at the beginning of the interview, through translation, and voluntarily proceeded with questioning. *Id.* at 31–33; 59–61. Subsequently, the detainees, including Defendant, were taken to South Central Regional Jail. *Id.* at 34.

After initially detaining the employees at the restaurant, HSI Agent Taylor contacted the U.S. Attorney's Office ("USAO") to start the process for criminal complaints. *Id.* at 35. This took place late on the afternoon of January 16, 2026, which was the Friday of Martin Luther King, Jr. weekend. *Id.* Because the courts were closed on Monday for the holiday, the Government contends that Tuesday, January 20, 2026, was the earliest the criminal complaints could have been sworn and filed. *Id.*; [ECF No. 24, at 3]. Consequently, the arrest warrants were issued on that day, and because Defendant was already in custody, the U.S. Marshals Service executed his warrant by informing the jail. *Id.*

The Magistrate Judge was informed of the arrests, but Defendant was not immediately taken to the courthouse because there was not a Spanish interpreter readily available. [Hr'g Tr., at 36]. Accordingly, on January 21, 2026, the Government filed a Motion for Detention Hearing. [ECF No. 4]. On January 22, the Magistrate Judge scheduled the initial appearance, preliminary hearing, and detention hearing for February 4, 2026. On February 3, 2026, a Grand Jury returned an Indictment against Defendant. [ECF No. 6]. On February 4, 2026, Defendant appeared before the Magistrate Judge, and he has since been in pretrial detention. [ECF Nos. 14, 16].

On February 24, 2026, Defendant filed a Motion to Suppress Statements and Dismiss Indictment, arguing that his arrest and interrogation were unconstitutional. [ECF No. 22]. On March 3, 2026, the Government responded. [ECF No. 24]. The court held a hearing on the matter on May 18, 2026, after which the parties submitted supplemental briefing.

3

## II.   LEGAL STANDARD

When resolving a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). In doing so, the court may hold an evidentiary hearing, at which "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993); *see also Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993)). In deciding preliminary questions of admissibility, the court is not bound by the Federal Rule of Evidence, except those governing privilege. Fed. R. Evid. 104(a); *see also* Fed. R. Evid. 1101(d). The burden of proof is on the party who seeks to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III.   DISCUSSION

Defendant raises four constitutional claims, arguing that his statements should be suppressed and the Indictment against him dismissed. First, Defendant contends that the Government violated his Fourth Amendment rights when agents took him into custody without an arrest warrant. Second, he asserts that the Government conducted a custodial interrogation in

4

violation of his Fifth Amendment rights. Third, Defendant argues that the Government failed to promptly present him for a judicial hearing in violation of Federal Rule of Criminal Procedure 5(a)(1)(A). Finally, Defendant contends the sum of the Government's actions violated fundamental Due Process. I address each argument in turn.

### A. Fourth Amendment

Defendant argues that when federal agents seized him, they violated his Fourth Amendment rights because they did not have an arrest warrant. [ECF No. 22, at 2]. However, the absence of an arrest warrant is not determinative in this case nor is the fact that the Government's investigation began as an administrative audit. This matter became criminal in nature after the Government reviewed the documents provided by restaurant management and applied for criminal search warrants, which upon execution, gave rise to the arrest encounter. The inquiry is thus better framed as whether, despite the absence of an arrest warrant, the seizure of Defendant was reasonable under the Fourth Amendment.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. While searches and seizures are generally lawful when conducted pursuant to a warrant supported by probable cause, *Payton v. New York*, 445 U.S. 573, 586–90 (1980), "the warrant requirement is subject to certain exceptions," *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "The touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39, (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)).

Where law enforcement officers execute a valid search warrant, that warrant carries with it the implicit authority to detain occupants of the premises for the duration of the search, commonly referred to as "a *Summers* detention." *Muehler v. Mena*, 544 U.S. 93, 98; *see also*

*United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 239 (4th Cir. 2001), *abrogated in part by Crawford v. Washington*, 541 U.S. 36 (2004). "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler,* 544 U.S. at 98 (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981)); *see also United States v. Smith*, 704 F.2d 723, 725 (4th Cir. 1983). Officers executing a search warrant may detain occupants in the immediate vicinity of the premises without any kind of particularized suspicion that someone is presently dangerous or involved in criminal activity. *Bailey v. United States*, 568 U.S. 186, 193–202 (2013).

"[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification" while the search of the premises is ongoing. *Muehler*, 544 U.S. at 101 (quoting *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991)). Courts have "held repeatedly that mere police questioning does not constitute a seizure." *Bostick*, 501 U.S. at 434; *see also INS v. Delgado*, 466 U.S. 210, 212 (1984). Therefore, under *Summers* and *Muehler*, detaining occupants during the execution of a search warrant constitutes a reasonable seizure, and questioning those individuals during the search does not trigger a separate Fourth Amendment event.  *Muehler*, 544 U.S. at 101 (quoting *Bostick*, 501 U.S. at 434–35. Because the detention is already constitutionally grounded, no further justification is required to ask questions—as a Fourth Amendment matter—during its pendency so long as the questioning does not prolong the period of detainment beyond what is required for the search. *Id.* at 101–02 (citing *Illinois v. Caballes*, 543 U.S. 405–08 (2005)).

An arrest, however, is a distinct Fourth Amendment event that must be constitutionally justified. An arrest does not necessarily require a warrant to be reasonable. *Payton v. New York*, 445 U.S. 573, 586–90 (1980); *United States v. Trappier*, 447 F. App'x 463, 464 (2011). "[T]he

6

general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Summers*, 452 U.S. at 700; *see also Virginia v. Moore*, 553 U.S. 164, 171 (2008). Critically, a lawful *Summers* detention does not itself authorize arrest, but it does create a lawful occasion during which probable cause may develop for officers to further act. *See Summers*, 452 U.S. at 705 (explaining that a search warrant based on probable cause "implicitly carries with it the limited authority to detain . . . while a proper search is conducted . . . . [U]ntil evidence establishing probable cause to arrest [the defendant] was found"). Upon a warrantless arrest, the Government bears the burden of demonstrating that the action was justified by probable cause given the totality of the circumstances. *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984)); *Maryland v. Pringle,* 540 U.S. 366, 371 (2003).

"Probable cause 'to justify an arrest [without a warrant] means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Trappier*, 447 F. App'x at 465 (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). "[L]aw enforcement officers . . . may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Additionally, "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). "This requirement cannot be undercut or avoided by simply pointing to the

fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* Where information obtained during a lawful *Summers* detention generates greater suspicion, officers may further be justified in detaining or arresting a subject. However, that authority depends on the sequence of events and the level of suspicion based on the totality of the circumstances.

As an initial matter, Defendant conceded at the suppression hearing that Defendant's initial detention during the execution of the search warrant was a valid *Summers* detention. [Hr'g Tr., at 6]. Defendant specifically takes issue with his arrest and transfer to a detention facility because he was not named in the executed search warrant or an arrest warrant. *Id.* Accordingly, the issue is whether the Government had probable cause to arrest Defendant after officers lawfully entered the premises pursuant to the search warrant and gathered additional information during the search.

The Government's witness, HSI Resident Agent in Charge Patrick Kelly, testified that after customers left the restaurant, the manager helped identify the remaining individuals, and it was then that Defendant became known to the officers. [Hr'g Tr., at 42, 46; Def.'s Ex. 1, at 3]. Agent Taylor's report states that Taylor asked management whether there were any employees present who had not been named in response to the Notice of Inspection in December, and management identified three individuals, including Defendant. [Def.'s Ex. 1, at 3]. Management then voluntarily provided Defendant's I-9 paperwork and associated documents to officers. [Hr'g Tr., at 42, 46].

As a result of the warrantless arrest, the Government bears the burden of establishing probable cause, and it has failed to do so here. The problem for the Government's case is that its proffered justification is not supported by the record. When asked at the hearing what the Government's probable cause basis was, counsel responded that agents received Defendant's

documents at the restaurant and determined on the spot that they appeared fraudulent. [Hr'g Tr., at 70]. However, nothing in the record shows that any officer ever scrutinized Defendant's documents at the restaurant. Nor does the record indicate that any such review factored into the officers' probable cause determination during the encounter. Agent Taylor's investigation report merely reflects receipt of Defendant's I-9 paperwork, not any observations or suspicions about it. [Def.'s Ex. 1, at 3]. Similarly, Agent Kelly's testimony establishes only that Agent Taylor obtained the documents from management; there is no indication Agent Taylor actually reviewed or assessed them at the scene. Nor is there any indication that Agent Kelly himself ever possessed or examined the documents. Specifically, Agent Kelly testified as follows:

> **Q.** Where was Mr. Dominguez found in the restaurant?
> **A.** He was in the kitchen.
> **Q.** And at the time he was detained and questioned, did you have these documents available to you -- were these documents in your possession?
> **A.** They weren't in my possession, no.
> **Q.** They were in Mr. Taylor's possession?
> **A.** (Witness nods.)
> **Q.** Is that correct?
> **A.** Yes.
> **Q.** So did you conduct any search of any databases to determine whether these documents were valid?
> **A.** I did not.
> **Q.** Do you know if Mr. Taylor did?
> **A.** I do not know.

[Hr'g Tr., at 46–47].

Agent Kelly did not know whether Agent Taylor conducted any queries regarding Defendant's documents, and notably he did not say whether Agent Taylor communicated any

9

suspicion about the documents. On cross examination, defense counsel referenced the Government's exhibit containing Defendant's documents and pointed out: "those documents by their face—if you facially look at them, they do not appear to be fraudulent." [Hr'g Tr., at 47]. Agent Kelly responded:

> **A.** Well, based on my experience reviewing a lot of fraudulent documents, the Social Security card does have aspects that appear to make it questionable.
>
> **Q.** Okay. What aspects?
>
> **A.** Due to the type. The font.
>
> **Q.** Okay. Anything else?
>
> **A.** No.
>
> **Q.** And -- but that's just speculation, would you agree?
>
> **A.** I've seen a lot of fraudulent documents.

*Id.* at 47–48.

Critically, Agent Kelly had the documents on the stand when he made that assessment. He made a seemingly present judgment with an otherwise silent record as to whether he ever possessed the documents on the scene and developed suspicion because of them. The manifest result is that I cannot conclude from the hearing when or if Agent Kelly ever possessed or viewed Defendant's documents prior to the arrest. Pursuant to Fourth Amendment law, I defer to officers' training and experience, but I only do so when there is evidence that their judgment was based on facts within their knowledge at the time of the encounter at issue. There is a troubling absence of specificity in Agent Kelly's testimony such that I cannot conclude that the I-9 paperwork factored into the probable cause analysis during the encounter.

Without particularized suspicion generated by an assessment of Defendant's I-9 paperwork, the other circumstances do not fill that gap. I cannot find that Defendant's "mere

10

propinquity to others independently suspected of criminal activity" is sufficient for probable cause. *Ybarra*, 444 U.S. at 91. Moreover, as to any argument that Defendant's detention was justified pursuant to civil enforcement, there was no evidence adduced at the hearing as to what specifically ICE agents suspected or asked Defendant or what Defendant may or may not have replied. Given this absence of evidence, I cannot assume that ICE's actions were lawful. *See* 8 U.S.C. § 1357; *see also United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) (citing cases) (explaining the powers of immigration officers without a warrant and finding "[b]ecause the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in [8 U.S.C.] § 1357(a)(2) means constitutionally required probable cause"); *see also United States v. Santiago-Francisco*, 819 F. App'x. 157, 162–63 (4th Cir. 2020) (distinguishing civil and criminal enforcement). Accordingly, I find that the Government did not provide evidence of probable cause to arrest Defendant without a warrant and as a result, violated the Fourth Amendment.

### B.    The Fifth Amendment Privilege and Due Process

Defendant further argues that his custodial statements should be suppressed under the Fifth Amendment because the Government cannot prove that his waiver was knowing, intelligent, and voluntary. [ECF No. 22, at 9]. In addition to the issue of waiver, Defendant contends that his statements were involuntary, warranting suppression pursuant to Due Process. *Id.* at 8.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this privilege, the government must follow procedural safeguards before subjecting a person to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda* . . . and the defendant knowingly, intelligently, and voluntarily waives those rights." *United States v. Holmes*, 670 F.3d

11

586, 591 (4th Cir. 2012) (citing *United States v. Guay,* 108 F.3d 545, 549 (4th Cir. 1997)). Moreover, the Government bears the burden of proving a defendant's waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The waiver analysis "has two distinct dimensions." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*; *United States v. Cristobal*, 293 F.3d 134, 139–40 (4th Cir. 2002). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *Cristobal*, 293 F.3d at 140.

The voluntariness of a defendant's waiver depends on whether his "'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Voluntariness "has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170. The Fifth Amendment privilege is not disrupted by "moral and psychological pressures to confess emanating from sources other than official coercion." *Id.* (quoting *Oregon v. Elstad,* 470 U.S. 298, 305 (1985)). To assess voluntariness, "courts must consider 'the totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation."

*United States. v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)) (citation modified).

As to "the knowingness of the waiver," this "often turns on whether the defendant expressed an inability to understand the rights as they were recited." *United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005). "Limited ability to understand English may render a waiver of rights defective." *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997). However, "such a circumstance does not necessarily thwart an effective waiver," *id.*, especially if the warnings "were recited to [the defendant] through . . . [an] interpreter, in [his] native language," *United States v. Dire*, 680 F.3d 446, 472, 475 (4th Cir. 2012) (quoting *United States v. Hasan*, 747 F. Supp. 2d 642 (E.D. Va. 2010), *aff'd sub nom. Dire*, 680 F.3d 446) (acknowledging that "the defendants 'may not have grasped the nature and processes of the United States judicial system,'" but finding "there is no indication that the defendants did not understand 'the concept of an attorney'") (citation modified). To analyze waiver, "the court should consider the background, experience, and conduct of the defendant." *Guay*, 108 F.3d at 549. Ultimately, it is not enough for the prosecution to demonstrate that a *Miranda* warning was given; it must show that the warning was given, understood, and not coerced. *Berghuis*, 560 U.S. at 384.

Regarding form, "waivers can be established even absent formal or express statements of waiver . . . ." *Id.* at 383 (distinguishing language from *Miranda* based on the subsequent "course of decisions"). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). While "mere silence is not enough," there are "at least some cases [in which] waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* The United States Supreme

13

Court has observed that "*Butler* made clear that a waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Berghuis*, 560 U.S. at 384 (quoting *Butler*, 441 U.S. at 373). "[A]fter giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights." *Id.* at 381, 388 (citing *Davis v. United States,* 512 U.S. 452, 459 (1994) and explaining that a defendant must invoke their *Miranda* rights unambiguously and unequivocally).

The same inquiry is used "when analyzing the voluntariness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause." *Cristobal*, 293 F.3d at 140. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167. The court should consider the totality of the circumstances, including "the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion," *Connelly*, 479 U.S. at 165, the relevant consideration is whether "law enforcement officials exploited [a defendant's] weakened condition with coercive tactics." *Cristobal*, 293 F.3d at 141. The ultimate question remains:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Schneckloth*, 412 U.S. at 225–26 (quoting *Culombe*, 367 U.S. at 602).

The Government has carried its burden of demonstrating by a preponderance of the evidence that Defendant's waiver was knowing, intelligent, and voluntary and that his statements were voluntary. While the Government did not record the interview, that is not required by law. Instead, the Government provided two witnesses at the hearing, and Defendant provided Agent

14

Taylor's arrest report with his motion, [ECF No. 22-4]. All three consistently stated that Defendant was given his *Miranda* rights through an interpreter in the Spanish language, and he acknowledged that he understood those rights before voluntarily agreeing to continue with the interview. *Id.*; [Hr'g Tr., at 31–32, 59, 61]. ERO Deportation Officer Sellenia Olson was the interpreter, and she testified at the hearing that the first thing she was asked to translate was Defendant's *Miranda* warnings. [Hr'g Tr., at 59, 61]. She confirmed that Defendant understood her and voluntarily gave up his rights before speaking to agents. *Id.* Because there is evidence that Defendant understood his rights and voluntarily relinquished them, I find his waiver was lawful.

Given another detained employee's deposition testimony, [ECF No. 22-2], there was an initial dispute about the timing of Defendant's interview. However, the testimony and reports confirm that Defendant was questioned the same day of his arrest and was not subjected to any coercive overnight confinement before questioning. [ECF No. 22-4; Hr'g Tr., at 30]. In particular, I find it convincing that the interpreter, Officer Olson, confirmed that she translated Defendant's post-arrest interview on January 16, 2026. *Id.* at 58, 60. Accordingly, I find that Defendant's statements were voluntary.

Defendant also advances another argument: that he should have been Mirandized before ICE questioned him at the restaurant regarding identification and alienage information. However, just as the Government cannot use vague references to the ICE encounter in its probable cause assessment, neither can Defendant use it now to argue there was a custodial interrogation—because no evidence was presented at the hearing as to what ICE agents knew or suspected or what they specifically asked. *Miranda* is only triggered once there is a custodial interrogation, and Defendant has not provided evidence as to how a lawful *Summers* detention was transformed into a custodial interrogation, bearing in mind that *Summers* and *Muehler* allow for questioning about

15

immigration status and identity. *See also United States v. Ferj-Inostroza*, 129 F.3d 1261 (4th Cir. 1997); *Quintana*, 623 F.3d at 1239–41; *United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020).

Accordingly, I find that there is no evidence that Defendant's Fifth Amendment rights were violated either by the post-arrest interview or by the alleged questioning at the restaurant.

## C.        Prompt Presentment

Defendant further argues that the delay between his arrest and presentment to the Magistrate Judge violated Rule 5 of the Federal Rules of Criminal Procedure.

Under Rule 5 of the Federal Rules of Criminal Procedure, "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a)(1)(A). Presentment as a procedural safeguard aims to "prevent secret detention," *Corley v. United States*, 556 U.S. 303, 306 (2009), and "secret interrogation of persons accused of crime," *McNabb v. United States*, 318 U.S. 332, 344 (1943), *superseded in part by statute*, 18 U.S.C. § 3501, *as recognized in Corley v. U.S.*, 556 U.S. 303 (2009).  "[A] district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate judge)." *Corley*, 556 U.S. at 322 (citation modified).

"Delays of up to six hours in bringing the defendant before a magistrate judge after arrest are presumptively reasonable." *United States v. Oliver*, No. 23-4739, 2025 WL 1984019, at *1 (4th Cir. July 17, 2025) (per curiam) (citing *United States v. Clenney*, 631 F.3d 658, 668 (4th Cir. 2011)). Within the six-hour safe harbor, a confession "is admissible, subject to the other Rules of Evidence, so long as it was made voluntarily and the weight to be given it is left to the jury." *Corley*, 556 U.S. at 322 (citation modified). "If the confession occurred before presentment and

16

beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed." *Id.*

Critically, "the remedy for such a violation is the exclusion of evidence, not dismissal of a criminal case." *Oliver*, 2025 WL 1984019, at *1 (quoting *United States v. Peeples*, 962 F.3d 677, 686 (2d Cir. 2020)) (internal quotation marks omitted). Even under the court's supervisory power and Rule 48(b) of the Federal Rules of Criminal Procedure, "a district court may not 'exercise its discretion to dismiss an indictment *with prejudice* . . . unless the violation caused prejudice to the defendant or posed a substantial threat thereof." *Id.* (quoting *United States v. Goodson*, 204 F.3d 508, 514 (4th Cir. 2000)) (emphasis in original).

Here, the Government did not fail to promptly present Defendant pursuant to Rule 5. Agents interviewed Defendant at the ICE facility in Poca after his arrest. Agent Kelly stated that there was about an hour and a half to two-hour timespan between Defendant's arrest and the interview. [Hr'g Tr., at 34]. He also testified that Defendant's interview was brief. *Id.* at 34. Accordingly, Defendant's statements fell within the six-hour safe harbor, and any further delay was reasonable due to holiday court closures and the court's ability to find an interpreter.

### D.      Fundamental Due Process

Conduct of law enforcement may also violate Due Process when it is "so outrageous as to shock the conscience of the court." *United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991); *United States v. Russell*, 411 U.S. 423, 431–32 (1973) (acknowledging that the case did not present facts "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction"). Convictions will violate Due Process if they are "based on evidence obtained by methods that

are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience.'" *Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (quoting *Rochin v. California*, 342 U.S. 165, 174 (1952)). In analyzing this standard, "appellate courts have over time continued to demonstrate a high shock threshold," requiring particularly "unsavory government conduct." *Osborne*, 935 F.2d at 36.

The Government's conduct in this case did not reach the high threshold of shocking the conscience. Agents and officers proceeded to the restaurant pursuant to the authority of a valid search warrant, which has not been contested. Though the record reflects some gaps in testimony regarding events at the restaurant, I do not find that law enforcement's conduct in this case was so brutal or offensive as to constitute a violation of fundamental Due Process.

### E.    The Exclusionary Rule and Suppression

The exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32 (2011). The rule "directs courts to suppress evidence obtained through 'an unlawful, warrantless arrest' where 'the link between the evidence and the unlawful conduct is not too attenuated.'" *Sanchez v. Sessions*, 885 F.3d 782, 787 (4th Cir. 2018) (quoting *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1040–41 (1984)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

Here, law enforcement violated the Fourth Amendment by arresting Defendant without a warrant or probable cause, and this arrest led to Defendant's otherwise voluntary statements at the ICE facility after he waived his *Miranda* rights. However, "*Miranda* warnings, alone and per se, cannot always make the act sufficiently a product of free will [to] break, for Fourth Amendment

18

purposes, the causal connection between the illegality and the confession." *Brown v. Illinois*, 422 U.S. 590, 603 (1975). "*Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Id.* at 602 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)); *Taylor v. Alabama,* 457 U.S. 687, 690 (1982) ("[T]his Court [has] firmly established that the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment . . . is not by itself sufficient to purge the taint of the illegal arrest.").

*Brown* sets forth three factors to assess when determining whether a defendant's statements were sufficiently attenuated: (1) "[t]he temporal proximity of the arrest and the confession," (2) "the presence of intervening circumstances," (3) "and, particularly, the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04. The burden of demonstrating the admissibility of a confession rests on the Government. *Id.* at 604. Yet, *Brown* "'does not require that each of the factors set forth be resolved in favor of the Government.'" *United States v. Seidman*, 156 F.3d 542, 549 (4th Cir. 1998) (quoting *United States v. Wellins,* 654 F.2d 550, 554 (9th Cir.1981)).

As to the first factor, there was a very close temporal proximity between the arrest and Defendant's statements. Agents questioned Defendant at the ICE facility in Poca about an hour and a half to two hours after the arrest. This short interval weighs against a finding of sufficient attenuation.

As to the second factor, there were no meaningful intervening events because Defendant was transported directly from the scene to the facility and questioned shortly thereafter. The Supreme Court of the United States has identified "[e]xamples of intervening circumstance[s] sufficient to break [the causal] chain," including "a hearing before a magistrate judge at which the

19

defendant was advised of his rights, an arraignment plus a six-day release from custody, and the issuance of a valid search warrant that resulted in the independent discovery . . . ." *United States v. Hill*, 649 F.3d 258, 269 (4th Cir. 2011) (quoting *Seidman*, 156 F.3d at 555 (Michael, J., concurring)) (citation modified). "The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest[,] [b]ut they are not the only factor to be considered." *Brown*, 422 U.S. at 603.

While evidence supports that Defendant's waiver and statements were voluntary under the Fifth Amendment, voluntariness in a Fifth Amendment sense "cannot assure in every case that the Fourth Amendment violation has not been unduly exploited." *Id.* I do not find in this case that *Miranda* warnings were sufficient to attenuate the taint of the unconstitutional arrest because Defendant was subjected to the full force and authority of Homeland Security agents over the course of approximately three to four uninterrupted hours before he ultimately confessed after being arrested with virtually all his coworkers. He was questioned criminally within a facility where he was supposed to be processed by ICE for civil deportation purposes. These facts, while not registering as coercive under a Fifth Amendment analysis, bear significantly on the issue of the causal connection between the violation and confession. As such, I do not find that Defendant's statements were an act of free will such that they purged the taint of the unlawful arrest.

The last factor is the purpose and flagrancy of the official misconduct. Demonstrating that a confession has been purged of the taint of the illegality is "a function of circumstantial evidence, with the burden of persuasion on the [Government]." *Kaupp v. Texas*, 538 U.S. 626, 633 (2003). The recurring consideration is whether conduct was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. "[T]he exclusionary rule serves to deter deliberate,

20

reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*

HSI and ICE agents can and do operate jointly, but they cannot devise their operations in ways that effectively or purposefully circumvent required legal processes—because they know better. Federal agents cannot play an obscured game of hot potato between agencies to evade responsibility for their unconstitutional acts.

The lack of testimony in this case setting forth a cohesive, consistent, and specific series of events is concerning given the totality of the circumstances. It is apparent that the Government could have called a witness with more direct knowledge, Agent Taylor, but did not do so. The burden is on the Government, and when asked about specific facts, Agent Kelly—the Government's primary witness— punted to an absentee agent or said the events were not within the scope of the criminal operation. In fact, Agent Kelly conceded that he was not the primary case agent in this case and agreed to the characterization of ICE's questioning as not being within the scope of the HSI operation that day. [Hr'g Tr., at 54]. It is not altogether clear what role Agent Kelly served at the restaurant, but he was sent to testify when he seems to be the person with the least personal knowledge of what specifically occurred. This is insufficient for the Government's burden.

Moreover, the Government's argument reflects that the purpose of the search warrant was primarily to locate persons identified from the I-9 audit and anyone else who "was there present who was engaged in criminal activity." [Hr'g Tr., at 7–8]. From the record, it is still unknown whether HSI agents ever looked at Defendant's documents other than taking possession of them. *Id.* at 47. Given the gaps in testimony, I am not assured that after (or even before) Agent Taylor obtained Defendant's documents that officers did not simply put Defendant with everyone else

21

and arrest him without ever looking at his documents—without ever having any suspicion particularized as to him. On this point, I agree with the *Brown* and *Dunaway* courts: there is a "quality of purposefulness" when the object of conduct is investigative such that officers "embark" on an "expedition for evidence." *Brown*, 422 U.S. at 605; *Dunaway v. New York*, 442 U.S. 200, 218 (1979). But in this case, execution of the search warrant had a quality of purposefulness in that it was an expedition for arrests to obtain confessions—not a search primarily for documents. For Defendant, the need for particularized suspicion as to him was wholly neglected. Though the agents knew Defendant was not identified in the warrant affidavit, they processed him with everyone else as if he had been predetermined to be a criminal.

This is the type of conduct upon which the exclusionary rule operates to have a deterrent effect. The agents' actions and omissions reflect sufficient culpability such that deterrence is worth the cost of exclusion.

Accordingly, I find that the factors weigh in favor of suppression. There is no evidence that Defendant's statements were sufficiently attenuated such that the taint of the illegal arrest was purged. As a result, the statements he made at the ICE facility shall be suppressed. *See United States v. Blue*, 384 U.S. 251, 255 (1966); *United States v. Morrison*, 449 U.S. 361, 365 (1981) (explaining that ordinarily the proper remedy for illegally obtained evidence is suppression and not dismissal of the indictment).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Statements and Dismiss Indictment, [**ECF No. 22**], is **GRANTED in part** and **DENIED in part**. As to Defendant's statements made at the ICE facility on January 16, 2026, the Motion is **GRANTED** and such statements are **SUPRESSED.** The Motion is **DENIED** as to its residual.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        May 27, 2026

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

23